**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, )<br>  )<br>  )<br>Plaintiff, )<br>  )<br>  )<br>- against - )<br>  )<br>  )<br>$7,206,157,717 ON DEPOSIT AT )<br>JP MORGAN CHASE BANK, N.A., )<br>IN THE ACCOUNTS SET FORTH ON )<br>SCHEDULE A, )<br>  )<br>  )<br>Defendant in rem. )<br>  ) | No. 10 Civ. 9398 (TPG)<br><br>ECF CASE |

**MEMORANDUM OF LAW (1) IN OPPOSITION TO THE MOTION OF ADELE FOX TO INTERVENE AND TO AMEND, MODIFY, OR RESCIND THE STIPULATION AND ORDER OF SETTLEMENT, AND (2) IN SUPPORT OF THE GOVERNMENT'S CROSS MOTION (A) TO DISMISS THE CLAIM OF ADELE FOX AND (B) FOR ENTRY OF A FINAL ORDER OF FORFEITURE**

PREET BHARARA
United States Attorney
Southern District of New York
Attorney for the United States of America

MATTHEW L. SCHWARTZ
BARBARA A. WARD
Assistant U.S. Attorneys
    -Of Counsel-

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT………………………………………………………………………1

BACKGROUND…………………………………………………………………………………………3

A.    The Fraud at Bernard L. Madoff Investment Securities…………………………………..3

B.    The Picower Estate's Agreement to Forfeit $7.2 Billion…………………………………4

C.    Proceedings in the Bankruptcy Court…………………………………………………………..6

      1.    The SIPA Liquidation………………………………………………………………..6

      2.    The "Net Equity" Decision…………………………………………………………..8

      3.    The Preliminary Injunction of Fox's Claim Against the Picower Estate………….9

      4.    The Approval of the Trustee's Settlement with the Picower Estate,
          and the Permanent Injunction of Fox's ClaimS……………………………………12

ARGUMENT……………………………………………………………………………………………14

POINT I:    FOX LACKS STANDING TO INTERVENE, OR TO ASSERT A CLAIM…….15

A.    Legal Standard…………………………………………………………………………………...15

      1.    Intervention Under Federal Rule of Civil Procedure 24…………………………15

      2.    Claims Under Supplemental Rule G……………………………………………..18

B.    Fox Lacks Constitutional Standing to Assert Her Claim or to Intervene
      Because She Does Not Have a Sufficient Interest in the Defendant In Rem……………20

C.    Fox Lacks Statutory Standing to Assert Her Claim…………………………………………...25

      1.    Fox's Claim Fails to Identify the Property in Which She Has an
          Alleged Interest………………………………………………………………………..25

      2.    Fox Failed to File an Answer……………………………………………………….27

POINT II:    FOX'S CONTENTION THAT SHE IS A VICTIM IS PREMATURE……......28

A.    The Remission and Mitigation Process……………………………………………………..28

B.    Fox is Probably Not a Victim, But That Issue Is Not Before the Court…………………30

POINT III:    THE GOVERNMENT'S COOPERATIVE RELATIONSHIP
              WITH THE TRUSTEE, INCLUDING CREDITING HIS SETTLEMENT
              WITH THE PICOWER ESTATE, IS ENTIRELY APPROPRIATE…………...33

CONCLUSION……………………………………….…………………………………….38

## TABLE OF AUTHORITIES

*Cases:*

*American Lung Association v. Reilly*,
141 F.R.D. 19 (E.D.N.Y. 1992)........................................................................17

*Brennan v. N.Y.C. Board of Education*,
260 F.3d 123 (2nd Cir. 2001)...........................................................................16

*DSI Associates, LLC v. United States of America*,
496 F.3d 175 (2d Cir. 2007)..............................................................................23

*Donaldson v. United States*,
400 U.S. 517 (1971)...........................................................................................17

*In re Dreier LLP*,
429 B.R. 112 (Bankr. S.D.N.Y. 2010).............................................................36

*In re Lyons*,
381 B.R. 444 (Bankr. S.D.N.Y. 2008).............................................................23

*Mercado v. U.S. Customs Service*,
873 F.2d 641 (2d Cir. 1989).............................................................................26

*In re New Times Securities Services*,
371 F.3d 68 (2d Cir. 2004)..................................................................................9

*New York News, Inc. v. Kheel*,
972 F.2d 482 (2d Cir. 1992).............................................................................16

*Peoples Westchester Saving Bank v. FDIC*,
961 F.2d 327 (2d Cir. 1992).............................................................................21

*Picard v. Chais,*
– B.R. –, 2010 WL 5841402 (Bankr. S.D.N.Y. Feb. 24, 2011)..................34

*Picard v. Fox*,
429 B.R. 423 (Bankr. S.D.N.Y. 2010)................................................... *passim*

*Reich v. ABC/York-Estes Corp.*,
64 F.3d 316 (7th Cir. 1995) ............................................................................16

*Restor-A-Dent Dental Laboratories, Inc. v. Certified Alloy Products, Inc.*,
725 F.2d 871 (2d Cir.1984)..............................................................................17

*SIPC v. Bernard L. Madoff Investment Securities LLC*,
424 B.R. 122 (Bankr. S.D.N.Y. 2010)....................................................................9, 23

*United States v. $3,000 in Cash*,
906 F. Supp. 1061 (E.D. Va. 1995) ...........................................................................22

*United States v. $9,041,598.68*,
163 F.3d 238 (5th Cir. 1998) ....................................................................................19

*United States v. $1,437.00 U.S. Currency*,
242 F. Supp. 2d 193 (W.D.N.Y. 2002) ......................................................................27

*United States v. 40 Acres of Real Property, More or Less*,
629 F. Supp. 2d 1264 (S.D. Ala. 2009)......................................................................27

*United States v. $38,852.00*,
328 F. Supp. 2d 768 (N.D. Ohio 2004)......................................................................20

*United States v. $79,000 at Bank of New York*,
No. 96 Civ. 3493 (MBM), 1996 WL 648934 (S.D.N.Y. Nov. 7, 1996)................21, 22

*United States v. $100,348.00 in U.S. Currency*,
354 F.3d 1110 (9th Cir. 2004) ..................................................................................26

*United States v. 105,800 Shares of Common Stock*,
830 F. Supp. 1101 (N.D. Ill. 1993) ...........................................................................23

*United States v. $345,510.00 in U.S. Currency*,
No. 01 Civ. 497 (PAM/JGL), 2002 WL 22040 (D. Minn. 2002) ...............................27

*United States v. $487,825.00 in United States Currency*,
484 F.3d 662 (3d Cir. 2007).....................................................................................25

*United States v. All Fund On Deposit In the Name of Khan*,
955 F. Supp. 23 (E.D.N.Y. 1997) ........................................................................21, 22

*United States v. Approximately 1,170 Carats of Rough Diamonds Seized at John
F. Kennedy International Airport on January 13, 2004*,
No. 05 Civ. 5816 (ARR), 2008 WL 2884387 (E.D.N.Y. July 23, 2008) ....................31

*United States v. BCCI Holdings (Luxembourg), S.A.*,
46 F.3d 1185 (D.C. Cir. 1995)...................................................................................24

*United States v. BCCI Holdings, Luxembourg, S.A.*,
69 F. Supp. 2d 36 (D.D.C. 1999)...............................................................................21

*United States v. Cambio Exacto, S.A.*,
    166 F.3d 522 (2d Cir. 1999)....................................................................................18

*United States v. Campos*,
    859 F.2d 1233 (6th Cir. 1988) ...............................................................................23

*United States v. Commodity Account Number 549 54930*,
    219 F.3d 595 (7th Cir. 2000) .................................................................................27

*United States v. Contents of Account Numbers 208-06070 and 208-06068-1-2*,
    847 F. Supp. 329 (S.D.N.Y. 1994) ........................................................................20

*United States v. Contents of Accounts (Friko Corporation)*,
    971 F.2d 974 (3d Cir. 1992)...................................................................................19

*United States v. Dreier*,
    682 F. Supp. 2d 417 (S.D.N.Y. 2010)..........................................................35, 36, 37

*United States v. Millan-Colon*,
    836 F. Supp. 1007 (S.D.N.Y. 1993)................................................................21, 22

*United States v. New Silver Palace Restaurant, Inc.*,
    810 F. Supp. 440 (E.D.N.Y. 1992) ........................................................................19

*United States v. New York Telegraph Co.*,
    644 F.2d 953 (2d Cir.1981)...................................................................................17

*United States v. One 1970 Buick Riviera Bearing Serial Number*
    *494870H910774*,
    463 F.2d 1168 (5th Cir. 1972) ..............................................................................31

*United States v. One 1982 Porsche 928*,
    732 F. Supp. 447 (S.D.N.Y. 1990) ........................................................................20

*United States v. One Silicon Valley Bank Account*,
    No. 05 Civ. 295, 2007 WL 1594484 (W.D. Mich. June 1, 2007)...............................20

*United States v. Peoples Benefit Life Insurance Co.*,
    271 F.3d 411 (2d Cir. 2001)...................................................................17, 18, 24, 25

*United States v. Pescatore*,
    - F.3d -, 2011 WL 644150 (2d Cir. Feb. 23, 2011)....................................................22

*United States v. U.S. Currency, $81,000.00*,
    189 F.3d 28 (1st Cir. 1999)...................................................................................19

*United States v. U.S. Currency in the Sum of Six Hundred Sixty Thousand, Two Hundred Dollars ($660,200.00), More or Less,*
    423 F. Supp. 2d 14 (E.D.N.Y. 2006) .............................................................34

*In re W.R. Huff Asset Management Co.,*
    409 F.3d 555 (2d Cir. 2005).........................................................................34

*Washington Electric Cooperative , Inc. v. Massachusetts Municipal Wholesale Electric Co.,*
    922 F.2d 92 (2d Cir.1990)............................................................................17

*Statutes, Regulations, and Rules:*

11 U.S.C. § 105(a) .............................................................................................11, 12

11 U.S.C. § 362(a)(3).............................................................................................11

15 U.S.C. § 78fff-2(c)(1)(B) ....................................................................................8

15 U.S.C. § 78*lll*(11) (2008) ..................................................................................8

18 U.S.C. § 981(a)(1)(C) .........................................................................................5

18 U.S.C. § 983(a)(4)(A) ...................................................................................18, 26

18 U.S.C. § 983(a)(4)(B)  ..................................................................................19, 27

21 U.S.C. § 853(i)(1) ........................................................................................28, 34

28 C.F.R. § 9.1(b)(2).........................................................................................30, 31

28 C.F.R. § 9.2(o) ..................................................................................................29

28 C.F.R. § 9.2(v) .............................................................................................29, 30

28 C.F.R. § 9.4(c)...................................................................................................29

28 C.F.R. § 9.4(e)...................................................................................................29

28 C.F.R. § 9.6.......................................................................................................29

28 C.F.R. § 9.8.......................................................................................................29

28 C.F.R. § 9.8(a)(1)..............................................................................................29

28 C.F.R. § 9.8(b) .............................................................................................29, 30

28 C.F.R. § 9.8(c)..................................................................................................30

28 C.F.R. § 9.9(c)..................................................................................................32

28 U.S.C. § 158(d)(2) ..............................................................................................9

Fed. R. Civ. P. 24..................................................................................................16

*Other Authorities:*

Stefan D. Cassella, *Asset Forfeiture Law in the United States* (2007) ..............................22

Plaintiff the United States of America (the "Government") by and through its attorney Preet Bharara, United States Attorney for the Southern District of New York, respectfully submits this memorandum of law in opposition to the motion of Adele Fox ("Fox") to Intervene and to Amend, Modify, or Rescind the Stipulation and Order of Settlement (the "Motion"), and in support of the Government's cross-motion to dismiss Fox's claim to the Defendant in rem and for entry of a final order of forfeiture. This memorandum of law has also been circulated to the Securities Investor Protection Corporation, the court-appointed trustee overseeing the liquidation of Bernard L. Madoff Investment Securities, and the representative of the estate of Jeffry M. Picower, all of whom join in the arguments made herein.

## PRELIMINARY STATEMENT

On December 17, 2010, the Government entered into an historic settlement with the estate of Jeffry M. Picower, which agreed to forfeit to the United States more than $7.2 billion. Picower had withdrawn that money from various investment accounts he controlled at Bernard L. Madoff Investment Securities LLC over the course of more than 30 years. When Madoff was arrested in December 2008 and his business revealed as a vast Ponzi scheme, it became apparent that those funds – which represent every penny that Picower withdrew from his accounts over the principal invested – were not investment profits, but were in fact other people's stolen money. The Picower estate therefore agreed to return those funds to the victims of Madoff's crime.

The only thing now standing between that $7.2 billion and Madoff's victims is Adele Fox. Fox – a Madoff client who, like Picower, withdrew more from her investment accounts than she put in – claims that she should share in that $7.2 billion along with Madoff's victims, and that the Government should not have credited the Picower estate with a separate $5 billion

settlement it reached with the Securities Investor Protection Act trustee appointed to liquidate Madoff's business.

Fox simply lacks standing to raise these issues in this case because she does not have the requisite legal interest in the forfeited funds to either intervene in this action or to file a claim. Rather than the "ownership" interest in the specific *res* that is the subject of this action necessary to establish standing, Fox's claims are not unique to these funds, but are general victim/creditor claims. Forfeiture law is clear and courts have routinely and uniformly held that such an interest is insufficient to confer standing to participate in forfeiture proceedings. This Court should do likewise.

Fox's substantive arguments, moreover, have either already been decided and rejected by another court, or are premature. The bankruptcy court overseeing the liquidation of Madoff's firm has already determined that claimants, such as Fox, who withdrew more than they put into their investment accounts, do not have allowable "net equity" claims within the meaning of the relevant statute, in a decision that is currently before the Second Circuit. Fox's argument that she is a creditor of the Picower estate, meanwhile, rests on the outcome of a lawsuit she filed in Florida, and which has been enjoined by the bankruptcy court, in another decision that she is currently appealing. Fox has provided no reason or authority for this Court to revisit or otherwise involve itself in those determinations. Finally, while the Government is skeptical of Fox's claim that she is a victim within the meaning of the criminal laws, that argument is premature. Judge Chin – in Madoff's criminal case – ordered that forfeited funds be distributed to victims of the fraud through the process of remission and mitigation, via petitions filed with the Department of Justice under the forfeiture regulations. It is in the context of such a petition that Fox ought make her argument that she is a victim. The Court should therefore deny Fox's

motion to intervene or disturb the settlement with the Picower estate, dismiss her claim to the forfeited funds, and enter a final order of forfeiture that will return the $7.2 billion that Madoff stole to its rightful owners. (A proposed order is attached as Exhibit B).

**BACKGROUND**

**A.      THE FRAUD AT BERNARD L. MADOFF INVESTMENT SECURITIES**

As set forth in the Government's Complaint, Bernard L. Madoff Investment Securities LLC ("BLMIS") was registered with the United States Securities and Exchange Commission ("SEC") as a broker-dealer and, beginning in or about 2006, as an investment advisor. Compl. ¶ 8. Bernard Madoff was BLMIS's founder, sole member, and principal; he was also the Chairman of the Board of Directors and majority owner of Madoff Securities International Ltd. ("MSIL"), a BLMIS affiliate established in the United Kingdom. *Id.* ¶ 9.

From at least as early as the 1980s until he was arrested in December 2008, Madoff operated BLMIS as a giant Ponzi scheme, accepting billions of dollars from his investment advisory ("IA") clients, and then failing to invest their money in actual securities. *Id.* ¶ 10. To conceal and perpetuate the fraud, Madoff caused bogus account statements to be disseminated to his investors and lied to his regulators. *Id.* As of November 30, 2008 – the date of the last BLMIS account statements – BLMIS had approximately 4,800 IA client accounts, whose (fake) account statements reflected balances worth tens of billions of dollars. *Id.* ¶ 18. In fact, BLMIS had only approximately $200 million to $300 million in cash.

As a result, on March 12, 2009, Madoff pleaded guilty to Information 09 Cr. 213 (DC), which charged him with securities fraud, investment advisor fraud, mail fraud, wire fraud, two counts of international money laundering, money laundering, false statements, perjury, false filings with the SEC, and theft from an employee benefit plan. *Id.* ¶ 19. Among other things,

3

Madoff admitted that despite his promise to clients and prospective clients that he would invest their money in shares of common stock, options, and other securities of well known corporations, he in fact almost never did. *Id.* Madoff further admitted that he attempted to conceal his fraud by, among other things, issuing false account statements and otherwise deceiving the IA clients, lying to regulators, and wiring money between BLMIS (in the United States) and MSIL (in the United Kingdom) to create the impression that BLMIS was actually trading securities. *Id.* On June 29, 2009, the Honorable Denny Chin sentenced Madoff to 150 years' imprisonment, billions of dollars worth of criminal forfeiture money judgment, and forfeiture of specific property. *Id.* ¶ 20.[1]

## B.   THE PICOWER ESTATE'S AGREEMENT TO FORFEIT $7.2 BILLION

Jeffry M. Picower ("Picower") held accounts at BLMIS in his name or in the names of other entities controlled by him since at least the late 1970s. Compl. ¶ 22. Between that time and December 2008, Picower – who funded his accounts in part with actual cash and securities – deposited a total of $619,456,578 into his BLMIS accounts, and withdrew a total of $7,825,614,295. Accordingly, the net withdrawals across all of the Picower accounts totaled

---

[1]   In addition to convicting Madoff, this Office has secured the guilty pleas and cooperation of two other BLMIS insiders, *see United States v. DiPascali*, No. 09 Cr. 764 (RJS); *United States v. Friehling*, No. 09 Cr. 700 (AKH), and is presently prosecuting five others, *see United States v. Bonventre, et al.*, No. 10 Cr. 228 (LTS). The Government has simultaneously pursued forfeiture in those criminal cases, as well as in a number of civil forfeiture actions besides this one. *See , e.g., United States v. $304,041.01 on Deposit at Citibank, N.A., et al.*, No. 10 Civ. 4858 (BSJ) (various assets held by BLMIS insiders Annette Bongiorno and Daniel Bonventre); *United States of America v. All Right, Title and Interest in the Real Property and Appurtenances known as 1081 Barnegat Lane, Mantoloking, New Jersey*, No. 10 Civ. 4857 (RWS) (various assets held by BLMIS insider JoAnn "Jodi" Crupi); *United States v. All Right, Title and Interest in the Real Property and Appurtenances Located at 167 Legion Place, Malverne, New York*, No. 09 Civ. 0455 (SHS) (various assets held by BLMIS insider Jerome O'Hara); *United States v. $625,000,000 on Deposit at JPMorgan Chase Bank, N.A.*, No. 10 Civ. 9116 (TPG) ($625 million held by BLMIS client and his family).

$7,206,157,717.  *Id.* ¶ 23.  (The fictitious account statements generated by BLMIS for the Picower accounts, meanwhile, reflected current balances of several billion dollars).

Once BLMIS was revealed as a fraud, it became clear that the withdrawals from the Picower accounts did not represent profits on actual investments, or margin loans, as the IA account statements reflected.  Rather, Picower and the other "net winners" of BLMIS – investors who withdrew more than they put in, including Fox – were paid in funds stolen from other investors, presumably the ones who got into the scheme later on.  Those profits, in other words, represented the proceeds of Madoff's crimes, and were therefore forfeitable to the United States, among other ways, pursuant to 18 U.S.C. § 981, which provides in relevant part that "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' [including wire fraud and securities fraud], or a conspiracy to commit such offense" is "subject to forfeiture to the United States," 18 U.S.C. § 981(a)(1)(C).  *Id.* ¶¶ 28-30.

Picower died in October 2009, and his wife was appointed the Executor of his estate.  *See* Stipulation and Order of Settlement (the "Stipulation," and cited as "Stip.") at 2.  While maintaining that Picower was unaware of the fraud at BLMIS, Mrs. Picower, on behalf of the estate, did not dispute – nor could she – that Picower had received the proceeds of Madoff's fraud.  *Id.*  Wishing to return that money to Madoff's victims, and also to be freed from litigation that interfered with Picower's last wishes to establish a charitable foundation with the bulk of his wealth, Mrs. Picower agreed to forfeit to the United States the full $7,206,157,717.  That is, the Picower estate agreed to forfeit *every penny* of the fictitious profits that was withdrawn from the Picower accounts over the years from BLMIS.  *See* Stip. ¶ 11 (Defendant in rem "represents the total net amount of withdrawals received by the Picower Parties from BLMIS through, and as

reflected in account statements for, the Picower [BLMIS customer] Accounts."). As part of the agreement, the Government agreed to credit against the forfeiture any settlement reached between the Picower estate and the liquidating trustee for BLMIS, up to the amount of $5 billion. *See id.* ¶¶ 4, 6.

On December 17, 2010, the Government filed this action and the Stipulation simultaneously, and the Court approved it that same day. Pursuant to the forfeiture laws, notice of the settlement was posted on an official government website (www.forfeiture.gov) for a period of at least 30 days, beginning December 18, 2010. *See* Declaration of Publication, attached hereto as Exhibit A. *See generally* Supp. R. G(4)(a)(iv)(C) (authorizing publication in this fashion). Claims to the forfeited funds therefore were due no later than 60 days after the first date of publication, or February 16, 2011, s*ee* Supp. R. G(5)(a)(ii)(B), with answers due no later than 21 days thereafter, *see* Supp. R. G(5)(b).

Fox's claim was the only one received, filed February 15, 2011 (the "Claim"). The Claim is against an undetermined portion of the forfeited funds, "the precise amount [of which] has yet to be determined." Claim ¶ 5. Fox never filed an answer to the Complaint.

## C.    PROCEEDINGS IN THE BANKRUPTY COURT

### 1.    The SIPA Liquidation

On December 11, 2008 – the date of Madoff's arrest – the SEC filed a civil complaint against BLMIS in this district. *See SEC v. BLMIS*, 08 Civ. 10791 (LLS). Several days later, the SEC's case was combined with an application of the Securities Investor Protection Corporation ("SIPC"), which alleged that BLMIS was not able to meet its obligations to securities customers as they came due and, as a result, its customers needed the protection afforded by the Securities Investor Protection Act ("SIPA").

Accordingly, on December 15, 2008, Judge Louis S. Stanton entered an order appointing Irving H. Picard, a partner at Baker & Hostetler LLP, as the trustee for the liquidation of BLMIS (in that capacity, the "Trustee") and removing the case to the bankruptcy court in this district, where it was assigned to the Honorable Burton R. Lifland. Although the case pending before Judge Lifland is technically a SIPA liquidation proceeding rather than a straight bankruptcy liquidation, the two are for most relevant purposes the same, the principal differences being (1) SIPA creates a creditor class of securities "customers" who are entitled to priority ahead of other general unsecured or priority unsecured claimants; (2) to the extent not fully satisfied from property collected for their benefit by the Trustee, those customers are entitled to have their claims satisfied by advances from SIPC;[2] and (3) the administrative expenses of the liquidation (*e.g.*, the attorneys' and consultants' fees, which in this case have already surpassed $200 million) are borne by SIPC at least until all customer claims are satisfied.[3]

Among other things, a SIPA trustee has the same power as a bankruptcy trustee to bring avoidance actions, also known as clawback suits, for the benefit of the estate. Accordingly, in May 2009, the Trustee sued Picower and related people and entities, seeking the return of all fictitious profits – an amount initially identified as $6.7 billion, and subsequently enlarged in briefing before the bankruptcy court to approximately $7.2 billion. *See* Trustee's Opposition to Motion to Dismiss the Complaint, filed Sept. 30, 2009, in *Picard v. Picower*, No. 09-1197 (BRL).

---

[2]    Indeed, to date, SIPC has committed to advance more than $793 million for BLMIS's customers.

[3]    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff personally. That case was subsequently consolidated with the SIPA liquidation.

2.      The "Net Equity" Decision

Because securities customer claims must be fully satisfied in a SIPA liquidation before other claims receive anything, it is obviously important to understand who holds such a claim. SIPA provides a priority for "customers" of the debtor, who share *pro rata* "on the basis and to the extent of their respective net equities."  15 U.S.C. § 78fff-2(c)(1)(B).  "Net equity," in turn, is defined as the "dollar amount" of the customer's account or accounts, according to a formula set out in the statute.  *See id.* § 78*lll*(11).[4]

SIPA was intended, of course, to be used primarily to liquidate *real* but insolvent investment firms, in which case determining the value of a customer's claim is complicated, but

---

[4]     As applicable here, SIPA provides, in full:

> The term "net equity" means the dollar amount of the account or accounts of a customer, to be determined by –
>
> (A)      calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer (other than customer name securities reclaimed by such customer); minus
>
> (B)      any indebtedness of such customer to the debtor on the filing date; plus
>
> (C)      any payment by such customer of such indebtedness to the debtor which is made with the approval of the trustee and within such period as the trustee may determine (but in no event more than sixty days after the publication of notice under section 78fff-2(a) of this title).
>
> In determining net equity under this paragraph, accounts held by a customer in separate capacities shall be deemed to be accounts of separate customers.

15 U.S.C. § 78*lll*(11) (2008).  This provision was amended in 2010 in ways not relevant to this case pursuant to the so-called Dodd-Frank bill; it is the version of SIPA in place in 2008, when the liquidation was commenced, that controls in any event.

8

straightforward.  How to determine the "net equity" of a customer's claim in a Ponzi scheme is somewhat less obvious.  The Trustee, however, determined a customer's net equity – consistent with the SIPA case law involving Ponzi schemes – by looking to "the amount of cash deposited by the customer into his BLMIS customer account less any amounts already withdrawn by him," *SIPC v. Bernard L. Madoff Inv. Secs. LLC*, 424 B.R. 122, 125 (Bankr. S.D.N.Y. 2010), *appeal docketed*, No. 10-2378 (2d Cir.) (argued Mar. 3, 2011), in a formulation often referred to as "cash in/cash out."  That view was supported by both SIPC and the SEC.  *Id.* at 122 & n.8.  Fox and other BLMIS investors, however, contended that their net equity should be determined by reference to "the amounts reflected on customers' November 30th Statements," *id.* at 122, notwithstanding that those statements were entirely fictitious.

Ultimately, the bankruptcy court, construing SIPA and the Second Circuit's decision in *In re New Times Securities Services*, 371 F.3d 68 (2d Cir. 2004) (rejecting the district court's net equity calculation, which was based on customers' "legitimate expectations"), sided with the Trustee.  The cash-in/cash-out formulation, Judge Lifland explained, is not only consistent with the statute, but also "is the more equitable and appropriate way to determine Net Equity, is consistent with Second Circuit precedent, and gives a workable blueprint for distribution to the victims of Madoff's incogitable scheme."  424 B.R. at 142.  Judge Lifland's net equity decision was appealed directly to the Second Circuit, pursuant to 28 U.S.C. § 158(d)(2), where it remains pending.

**3.      The Preliminary Injunction of Fox's Claims Against the Picower Estate**

Under the definition of "net equity" employed by the Trustee, Fox – though filing a claim in the liquidation and therefore submitting to the bankruptcy court's jurisdiction – has no SIPA customer claim:  she is a so-called "net winner," who withdrew more than she deposited into her

accounts at BLMIS.  According to papers filed in the bankruptcy court, Fox had at least two (and

as many as seven) BLMIS accounts, *see Picard v. Fox*, 429 B.R. 423, 428 (Bankr. S.D.N.Y.

2010), *appeal docketed*, Nos. 10 Civ. 4652 (JGK), 10 Civ. 7101 (JGK), 10 Civ. 7219 (JGK),

which reflected fictitious account balances of at least $2.8 million, *see id.*[5]

Unable to recover in the SIPA liquidation (at least, until all valid customer claims are

satisfied), in February 2010 Fox filed a lawsuit in the United States District Court for the

Southern District of Florida against Picower and related people and entities, seeking (among

other things) the additional fake investment returns shown on her BLMIS account statements.

*Id.* at 429.  She purports to represent a class of all "net winners." *Id.*  The bankruptcy court

described Fox's lawsuit, later consolidated with a suit brought by another net winner, this way:

> They assert claims against the Picower Defendants for, *inter alia*,
> conversion, unjust enrichment, conspiracy, and violations of
> Florida's [RICO laws], all arising from the Picower Defendants'
> alleged involvement in Madoff's Ponzi scheme. They assert
> injuries in the form of lost investment income and returns on their
> BLMIS investments, and tax payments made in connection with
> non-existent profits. The Fox Complaint asserts additional harm in
> the form of "exposure for monetary losses in connection with the
> Trustee's clawback efforts."  On the basis of their claims, the
> Florida Plaintiffs seek relief in the form of, *inter alia*,
> compensatory damages, prejudgment interest, an equitable
> accounting and the imposition of a constructive trust, disgorgement
> of ill gotten gains or restitution, treble damages, and punitive
> damages.

*Id.* at 429 (citations omitted).

Concerned about the Fox lawsuit's potential effect on his litigation against, and

negotiations with, the Picower estate, the Trustee sought to enjoin the Florida action, under at

---

[5]     Fox filed two claims in the SIPA proceeding.  The Trustee denied both of her claims on
the grounds that, with respect to each, she withdrew more than she deposited.  In one account,
she withdrew $1,040,138.18 more than she deposited, and in the other, $211,371.90.  Fox has
objected to the Trustee's determination, and while those objections technically remain pending,
the bankruptcy court's net equity determination as a practical matter overrules her objections.

least three theories.  *First*, he argued that the lawsuit violated the Bankruptcy Code's automatic stay (applicable to SIPA proceedings) because the Florida lawsuit was an "act to obtain possession of . . . or to exercise control over property of the estate." *Id.* at 430 (quoting 11 U.S.C. § 362(a)(3)).  *Second*, the Trustee invoked the bankruptcy court's need to preserve its own jurisdiction, arguing that the Florida actions had the potential to invite similar actions by other creditors and undermined the net equity ruling.  And *third*, the Trustee contended that the Florida action interfered with significant settlement negotiations with the Picower estate, to the detriment of BLMIS's customers as a whole.

Judge Lifland agreed on both scores.  He first held that Fox "violated the [automatic] stay by usurping causes of action belonging to the estate," *id.* at 430, because their claims against Picower were general claims having to do with Picower's relationship with BLMIS, which any BLMIS creditor could have brought.  Fox, in short, had no particular relationship with Picower that would give rise to a unique claim against him – she was not recruited by him, did not invest through him, or in fact have any relationship with him whatsoever.  Allowing Fox to litigate against Picower directly – and therefore potentially receive a separate recovery outside of the liquidation proceedings – would effectively "convert the bankruptcy proceeding into a race to the courthouse," and "derail the bankruptcy proceedings."  *Id.* at 432 (internal quotation marks omitted).  Fox's claims therefore violated the automatic stay and, the Court held, were therefore "void *ab initio*."  *Id.* at 433-34.

Judge Lifland also held that Fox's claims should be barred as a matter of equity, to protect his jurisdiction, under section 105(a) of the Bankruptcy Code.  *See* 11 U.S.C. § 105(a) (allowing bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provision of" the Bankruptcy Code).  At the time, the Trustee was

11

engaged in negotiations with the Picower estate, and sought the injunction for the benefit of the estate because he was, according to his counsel, "on the brink" of a multi-billion dollar settlement, but was embroiled in settlement negotiations which were "extremely delicate . . . involving multiple parties and governmental agencies . . . very difficult, time-consuming and involving extraordinary sums of money." 429 B.R. at 435. The court therefore enjoined the Florida action for the additional reason that it endangered a substantial benefit to the BLMIS estate.

Finally, Judge Lifland also held that the Florida action should be enjoined under section 105(a) for an additional reason. "While their causes of action may differ in name, the Florida Plaintiffs seek to recover the very funds sought by the Trustee through his avoidance actions. The Florida Actions thus have the potential to substantially undermine this Court's jurisdiction, as further prosecution could ultimately result in another court's determining how potential estate funds are distributed among certain BLMIS customers. This is particularly alarming given that any judgment awarded to the Florida Plaintiffs would exceed their entitlement to BLMIS distribution under SIPA and this Court's Net Equity Decision." *Id.* at 437.

Fox appealed Judge Lifland's decision, which has been fully briefed and is pending before Judge Koeltl.

**4.    The Approval of the Trustee's Settlement with the Picower Estate, and the Permanent Injunction of Fox's Claims**

On December 17, 2010, the Trustee and the Picower estate finalized their settlement, which called for the Picower estate to return $5 billion. As set forth in the Trustee's motion in support of that settlement, that figure represents, in his view, both a reasonable compromise of his $7.2 billion clawback claims, and also roughly corresponds to the value of the outstanding margin loan owed by Picower to BLMIS. As part of the settlement, the Trustee also sought an

12

order permanently enjoining any claims against the Picower estate that could have been brought by the Trustee.

Fox objected.  She advanced principally two arguments.  *First*, she contended that the scope of the injunction sought by the Trustee was too broad.  *Second*, she argued, absurdly, that the Picower estate, the Trustee, and the Government somehow conspired to recover more than they were entitled to "in order [to] divest the Picower Defendants of the assets that should be available to satisfy Fox's valid and independent claims" in the Florida action.

Judge Lifland granted the Trustee's motion and approved the settlement, over all objections.[6]  With respect to the first point, Judge Lifland made clear that the permanent injunction issued as part of the settlement (though not targeted explicitly at Fox) was no broader than the preliminary injunction, and that if Fox were to prevail in her appeal of the preliminary injunction by showing that she did in fact have independent claims, then nothing in the permanent injunction would bar those claims.

With respect to the second point, the bankruptcy court found that "[t]he suggestion by certain Objectors that the negotiations among the Trustee, the Government and the Picower Defendants were not at arms' length is not credible, particularly given that the Agreement and forfeiture to the Government will result in the recovery of one hundred percent of the Picower Defendants' net withdrawals from BLMIS."  Order dated Jan. 13, 2011, at ¶ 4, *Picard v. Picower*, No. 09-1197 (BRL).  As to the contention that the $5 billion settlement was more than the Trustee was legally entitled to, the court found that the Trustee had sought $7.2 billion, *id.* ¶

---

[6]    There were a total of three objections to the Trustee's settlement in the bankruptcy court. Fox filed one, and the plaintiffs in the other Florida action consolidated with Fox's filed another, arguing in essence that the Trustee's settlement was somehow for too much money.  The third objection was from *pro se* claimants, who contended that the Trustee's settlement was for too little, because he failed to recover interest or subsequent (real) investment gains realized by the Picower estate on the funds.

C, and that $5 billion represented a "fair, reasonable, [and] equitable" resolution of his claims, *id.* ¶ 6.

Again, Fox appealed. The appeal has been assigned to Judge Koeltl as related to Fox's appeal of the preliminary injunction order; briefing has not yet commenced. *See* Nos. 11 Civ. 1298 (JGK), 11 Civ. 1328 (JGK).

## ARGUMENT

Fox's interference in this forfeiture is a naked attempt to relitigate issues already decided by the bankruptcy court, all of which are on appeal. She argues that by crediting the Trustee's settlement with the Picower estate against the forfeiture, the Government has allowed the Trustee to take "far in excess of what he could legitimately recover in the bankruptcy court, all to the detriment of the vast majority of Madoff's Ponzi scheme victims," *i.e.*, net winners. Motion (cited as "Mot.") at 1.

This position is animated, of course, by the bankruptcy court's net equity determination, which means that Fox will not share in the SIPA liquidation until all "net loser" customer claims have been satisfied. She therefore argues that the amount credited to the Trustee under the Government's settlement is excessive. The bankruptcy court has already held, however, that the Trustee's settlement is reasonable and appropriate, and represents a compromise of his litigation position, not a windfall. In any event, Fox's position presumes that she is a "victim" Under the Department of Justice regulations. While the final determination of petitions for remission has not been made, it is the Government's preliminary view, based on an understanding of the appropriate regulations, that it is highly unlikely that "net winners" are "victims" within the meaning of the applicable federal forfeiture laws. However, that issue is not ripe, and is, respectfully, not a question for this Court.

14

For those reasons, Fox lacks standing to raise these complaints in this case. This case is concerned with the forfeiture of a discrete, albeit enormous, asset traceable to proceeds of Madoff's fraud. The questions of who Madoff's victims are and therefore who will recover in the forfeiture fund (which is comprised of many other forfeitable assets) is simply not before this Court. The only question in this case is whether Fox has a specific ownership interest in the Defendant in rem funds. She does not, and she does not even claim to have one. Accordingly, her claim must be dismissed, her motion denied, and a final order of forfeiture entered. Then, in the process of remission and mitigation, Fox may submit a petition setting forth her argument that she is a victim.

**POINT I**

**FOX LACKS STANDING TO INTERVENE, OR TO ASSERT A CLAIM**

Fox claims to have an interest in the $7.2 billion Defendant in rem because she is (in her view) a victim of Madoff's fraud entitled to share in the forfeiture fund, a customer of BLMIS entitled to share in the SIPA customer fund, and a tort plaintiff with a valid cause of action against the Picower estate. Even if that were all true, however, Fox would still lack standing to intervene in this action or to file a claim because she lacks an *in rem* interest – that is, a property interest specifically in the Defendant in rem.

**A.    Legal Standard**

**1.    Intervention Under Federal Rule of Civil Procedure 24**

As relevant here, the Federal Rules of Civil Procedure provide:

> (a)    Intervention of Right.  On timely motion, the court must permit anyone to intervene who:

*    *    *

15

> (2)   claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.
>
> (b)   Permissive Intervention.
>
> > (1)   In General.  On timely motion, the court may permit anyone to intervene who:
> >
> > > *       *       *
> >
> > > (B)   has a claim or defense that shares with the main action a common question of law or fact.

Fed. R. Civ. P. 24.

The Second Circuit has identified four criteria that a movant must satisfy in order to intervene as of right under Rule 24(a)(2):  (1) the application to intervene must be timely; (2) the movant must have an interest in the action; (3) the movant must be so situated that disposition of the action, as a practical matter, may impede or impair his ability to protect that interest; and (4) the movant's interest must not be adequately represented by the existing parties to the suit. *Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123, 128-29 (2d Cir. 2001) (citing *New York News, Inc. v. Kheel*, 972 F.2d 482, 485 (2d Cir. 1992)); *see generally Reich v. ABC/York-Estes Corp.*, 64 F.3d 316, 322 (7th Cir. 1995) ("In ascertaining a potential intervenor's interest in a case, our cases focus on the issues to be resolved by the litigation and whether the potential intervenor has an interest in those issues.").

In the context of a civil forfeiture, the Second Circuit has explained that the "interest" the putative intervenor seeks to advance must be directly impacted by the forfeiture, and not in any way contingent:

16

> For an interest to be cognizable under Rule 24(a)(2), it must be "direct, substantial, and legally protectable." *Washington Elec. Coop., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 922 F.2d 92, 97 (2d Cir.1990); *accord Donaldson v. United States*, 400 U.S. 517, 531, 91 S. Ct. 534, 27 L.Ed.2d 580 (1971) (requiring "significantly protectable interest"), *superceded by statute on other grounds as stated in United States v. New York Tel. Co.*, 644 F.2d 953, 956 (2d Cir.1981); *Kheel*, 972 F.2d at 486; *Restor-A-Dent Dental Labs., Inc. v. Certified Alloy Prods., Inc.*, 725 F.2d 871, 874 (2d Cir.1984) ("[S]uch an interest must be direct, as opposed to remote or contingent."). "An interest that is remote from the subject matter of the proceeding, or that is contingent upon the occurrence of a sequence of events before it becomes colorable, will not satisfy the rule." *Washington Elec.*, 922 F.2d at 97. *See also American Lung Ass'n v. Reilly*, 141 F.R.D. 19 (E.D.N.Y. 1992) (rejecting argument "that part two of . . . Rule 24(a)(2) requires only that an intervenor have a 'potential' interest in a lawsuit").

*United States v. Peoples Benefit Life Ins. Co.*, 271 F.3d 411, 415 (2d Cir. 2001) (per curiam).

Thus, for example, in *Peoples Benefit Life Insurance*, the Court affirmed a denial of a motion to intervene filed by an insurance company that claimed to hold a constructive trust over forfeitable property. Even assuming that the claimant held a constructive trust, the Second Circuit held it was not a sufficiently "direct, substantial, and legally protectable" interest to warrant intervention in the forfeiture because "the property allegedly subject to the constructive trust . . . is not readily identifiable or traceable to the property subject to forfeiture," *id.* at 416, a distinction that the court observed "weighs *strongly*" against recognizing the alleged interest as "direct, as opposed to remote or contingent," *id.* (emphasis in original).

Separately weighing against the intervenor was that "recognizing the alleged constructive trust . . . as a sufficiently direct, substantial, and legally protectable' interest to support intervention would allow Peoples to circumvent the state receivership proceedings and potentially gain an advantage over other creditors and policyholders. . . . Furthermore, there is a

17

risk that allowing Peoples to intervene in this case may open the door for other creditors and thereby undermine state receivership laws." *Id.* at 417.

### 2.    Claims Under Supplemental Rule G

Fox also seeks to participate in this case through her claim to the forfeited funds, submitted pursuant to Rule G(5) of the Supplemental Rules for Certain Admiralty and Maritime Claims to the Federal Rules of Civil Procedure (the "Supplemental Rules," also cited as "Supp. R."). *See also* 18 U.S.C. § 983(a)(4)(A) (person who wishes to contest the forfeiture of property may file a claim "asserting such person's interest in the property in the manner set forth in the Supplemental Rules").

"In order to contest a governmental forfeiture action, claimants must have both standing under the statute or statutes governing their claims and standing under Article III of the Constitution as required for any action brought in federal court." *United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 526 (2d Cir. 1999). To have statutory standing, a claimant in a civil forfeiture proceeding must comply with Supplemental Rule G, which provides in relevant part:

> (5)    Responsive Pleadings
>
> (a)    Filing a Claim
>
> (i)    A person who asserts an interest in the defendant property may contest the forfeiture by filing a claim in the court where the action is pending. The claim must:
>
> (A)    identify the specific property claimed;
>
> (B)    identify the claimant and state the claimant's interest in the property
>
> (C)    be signed by the claimant under penalty of perjury; and

18

(D)    be served on the government
attorney. . . .

Supp. R. G(5).  The claimant must also serve and file an answer to the complaint or a motion

under Federal Rule of Civil Procedure 12 within 20 days after filing the claim.  *See* Supp. R.

G(5)(b); 18 U.S.C. § 983(a)(4)(B).

To have constitutional standing, meanwhile, a claimant must demonstrate an adequate

"interest" in the forfeitable property.  "If the claimant cannot show a sufficient interest in the

property to give him Article III standing there is no case or controversy, in the constitutional

sense, capable of adjudication in the federal courts."  *United States v. New Silver Palace*

*Restaurant, Inc.*, 810 F. Supp. 440, 442 (E.D.N.Y. 1992) (internal quotation marks, alterations,

and citations omitted).  *See also United States v. U.S. Currency, $81,000.00*, 189 F.3d 28, 35 (1st

Cir. 1999); *United States v. $9,041,598.68*, 163 F.3d 238, 244-45 (5th Cir. 1998); *United States*

*v. Contents of Accounts (Friko Corporation)*, 971 F.2d 974, 985 (3d Cir. 1992).  As a result, "[i]t

is the claimant who bears the burden of demonstrating standing."  *New Silver Palace Restaurant*,

810 F. Supp. at 442.

The civil forfeiture statutes define what it means for a claimant to have a legally

cognizable ownership interest in property:

In this subsection, the term "owner" –

(A)    means a person with an ownership interest in the specific property
sought to be forfeited, including a leasehold, lien, mortgage,
recorded security interest, or valid assignment of an ownership
interest; and

(B)    does not include –

(i)    a person with only a general unsecured interest in, or claim
against, the property or estate of another;

19

(ii)    a bailee unless the bailor is identified and the bailee shows a colorable legitimate interest in the property seized; or

(iii)    a nominee who exercises no dominion or control over the property.

18 U.S.C. § 983(d)(6).[7]

Thus, "[t]o establish standing, 'the claimant must demonstrate that he has a colorable ownership, possessory or security interest in at least a portion of the defendant property.'" *United States v. One Silicon Valley Bank Account*, No. 05 Civ. 295, 2007 WL 1594484, at *2 (W.D. Mich. June 1, 2007) (quoting *United States v. $38,852.00*, 328 F.Supp.2d 768, 769 (N.D. Ohio 2004)); *see also* U*nited States v. Contents of Account Numbers 208-06070 and 208-06068-1-2*, 847 F. Supp. 329, 333 (S.D.N.Y. 1994); *United States v. One 1982 Porsche 928*, 732 F. Supp. 447, 451 (S.D.N.Y. 1990).

**B.    Fox Lacks Constitutional Standing to Assert Her Claim or to Intervene Because She Does Not Have a Sufficient Interest in the Defendant In Rem**

Applying the standards above, Fox plainly lacks standing to intervene in this action or to assert a claim because she lacks a sufficient interest in the Defendant in rem. Fox asserts essentially three potential interests in the $7.2 billion:  as a victim in the forfeiture proceedings, as a customer in the SIPA liquidation proceedings, and as a potential judgment creditor against the Picower estate in separate litigation currently stayed in Florida. None of those interests is sufficient to allow her to intervene.

*First*, Fox claims that she is a victim of Madoff's fraud; indeed, this is the factor that she relies on principally. *See* Mot. at 7 ("as a 'victim' of the Madoff Ponzi scheme, Fox has a

---

[7]    This subsection pertains to claimants asserting that they are "innocent owners" of funds subject to forfeiture, and therefore applies to the claim asserted by Fox. *See* Claim ¶ 5 ("I, along with the other Claimants are innocent, beneficial, legal and equitable owners of a portion of the Funds. . . .").

20

current and non-contingent interest in the forfeited funds"). As an initial matter, and as set forth at greater length below, Fox's victimhood is very much contingent: while the Government is skeptical that Fox can be a victim within the meaning of the forfeiture laws, that has not yet been determined and this is not the forum to determine it.

Even assuming that Fox is a victim, she still would have no standing in this action because, under New York law, once someone deposits funds in a bank or investment account – even as a result of fraud – they lack a particularized interest in those funds. *See Peoples Westchester Sav. Bank v. FDIC*, 961 F.2d 327, 330 (2d Cir. 1992) (as soon as money is deposited, it is deemed to be the property of the bank, and the relationship between the bank and the depositor is that of debtor and creditor); *United States v. All Fund On Deposit In the Name of Khan*, 955 F. Supp. 23, 26-27 (E.D.N.Y. 1997) (under New York Law, an individual loses title to funds once the funds are deposited into an account held in the name of a third person); *United States v. $79,000 at Bank of New York*, No. 96 Civ. 3493 (MBM), 1996 WL 648934, at *5 (S.D.N.Y. Nov. 7, 1996) (same); *United States v. Millan-Colon*, 836 F. Supp. 1007, 1020 (S.D.N.Y. 1993) (under New York law, once a check is certified by a bank, it becomes the property of the payee and the drawer loses its ownership interest).

Indeed, courts routinely hold that victims lack standing to participate in judicial forfeiture proceedings for lack of standing – except, of course, as the ultimate recipient of funds forfeited to the United States and then distributed to victims as restitution or through the process of remission and mitigation. *See, e.g., United States v. BCCI Holdings, Luxembourg, S.A.*, 69 F. Supp. 2d 36, 58-60 (D.D.C. 1999) (holding that victims lack standing in forfeiture proceedings under RICO because "[u]nsecured creditors have a legal interest in the defendant's estate as a whole, but they lack any specific interest in the particular asset that has been forfeited to the

21

Government. . . A fraud victim who voluntarily transferred property to the defendant has a cause of action in tort against the defendant but has no greater interest in the forfeited property than does any other general creditor."); *see also United States v. $3,000 in Cash*, 906 F. Supp. 1061 (E.D. Va. 1995) (even though claimant/victim could trace his money to seized bank account, title was passed to perpetrator, making claimant an unsecured creditor without standing); *Khan*, 955 F. Supp. at 26-27 (customers, who gave funds to a money transmitter for transfer to Pakistan, lacked standing to contest forfeiture of the transmitter's bank account into which the funds had been deposited); *$79,000 at Bank of New York*, 1996 WL 648934, at *4-6 (claimants who deposited funds into an account held in the name of a third party lacked standing to contest forfeiture of the funds seized from the account); *Millan-Colon*, 836 F. Supp. at 1020 (drawer of check lacked standing to challenge forfeiture of the check or the funds it represented because, once the check was certified, it became the property of the payee and the drawer no longer had an ownership interest in it). *See generally* Stefan D. Cassella, *Asset Forfeiture Law in the United States* § 10-3 (2007) ("Persons who can trace their money into the bank account of a third person, but who have no right to withdraw that money, do not have standing to contest the forfeiture. Notwithstanding the provenance of the money, a person who surrenders his money to a third party by putting his money in the third party's bank account becomes, at most, an unsecured creditor with a cause of action against the account holder.").[8]

---

[8]    Fox's asserted status as a victim also does not give her an interest in the forfeited property because there is no requirement that property subject to forfeiture be distributed to victims. Although that is certainly the Government's intention in this case, the forfeiture laws do not require it, *see generally United States v. Pescatore*, – F.3d –, 2011 WL 644150 (2d Cir. Feb. 23, 2011), which is another reason why any interest of Fox's in the forfeited funds is contingent, at best. For the same reason, Fox's argument that the Trustee is not a victim, *see* Mot. at 11-12, is beside the point – although it should be underscored that the Trustee is not the ultimate recipient of *any* of the forfeited funds, which will *all* go to victims of Madoff's fraud. *See* Stip.

*Second*, Fox claims that she has a valid customer claim in the SIPA proceeding.  Even if such an interest were sufficient to confer standing – which it is not, for the same reasons that victim status is insufficient – the bankruptcy court has already rejected that contention in its net equity decision, *see SIPC v. Bernard L. Madoff Inv. Secs. LLC*, 424 B.R. 122, making it far too speculative to be the sort of "direct, substantial, and legally protectable" interest that would permit Fox to intervene.

*Third*, and finally, Fox claims to have valid tort claims against the Picower estate.  That, too, is highly speculative.  As an initial matter, those claims have twice been enjoined by the bankruptcy court, in decisions pending appeal.  *See Picard v. Fox*, 429 B.R. 423; Order dated Jan. 13, 2011, at 6-8, *Picard v. Picower*, No. 09-1197 (BRL).  If Fox were to succeed in overturning the bankruptcy court's injunctions, she would then have to litigate, and win, against the Picower estate in Florida.  And if she did so, she would be a judgment creditor – and even then would hold only a general unsecured claim against the Picower estate, not a specific interest in the Defendant in rem funds.  *See United States v. Campos*, 859 F.2d 1233, 1239 (6th Cir. 1988) ("A general creditor's interest . . . in a particular forfeited asset is no different conceptually from a tort claimant's position (even if reduced to an 'enforceable judgment')."); *In re Lyons*, 381 B.R. 444, 452 (Bankr. S.D.N.Y. 2008) (judgment creditors hold only a general unsecured interest).  But "[i]t is well-established that general unsecured creditors do not have standing to contest the forfeiture of their debtor's property." *United States v. 105,800 Shares of Common Stock*, 830 F. Supp. 1101, 1117 (N.D. Ill. 1993); *see DSI Associates, LLC v. United States of America*, 496 F.3d 175, 184 (2d Cir. 2007) (general creditor does not possess a "legal right, title, or interest in the property that was forfeited as required for standing" to assert an ancillary claim

---

at 4 ("the SIPA Trustee intends to distribute th[e] funds [paid to him by the Picower estate] to the victims of the fraud perpetrated through BLMIS").

23

in criminal forfeiture proceedings); *United States v. BCCI Holdings (Luxembourg), S.A.*, 46 F.3d 1185, 1191 (D.C. Cir. 1995) ("a general creditor can never have an interest in specific forfeited property"). *See also* 18 U.S.C. § 983(d)(6)(B) ("a person with only a general unsecured interest in, or claim against, the property or estate of another" is not an "owner").

Simply put, Fox has no right that can be vindicated in this action. Indeed, it is impossible to differentiate Fox's asserted bases for intervention from the ones rejected by the Second Circuit in *Peoples*. There, as here, the putative intervenor claimed to have an interest in property subject to forfeiture by virtue of, among other things, a constructive trust. There, as here, the property was also subject to claims in liquidation proceedings. The Second Circuit nonetheless held that Peoples, the intervenor, lacked a sufficient interest. *First*, the court held, its interest was not different than any other creditor's interest in the liquidation proceedings. *See United States v. Peoples Benefit Life Ins. Co.*, 271 F.3d at 417 ("recognizing the alleged constructive trust . . . as a sufficiently direct, substantial, and legally protectable' interest to support intervention would allow Peoples to circumvent the state receivership proceedings and potentially gain an advantage over other creditors and policyholders. . . . Furthermore, there is a risk that allowing Peoples to intervene in this case may open the door for other creditors and thereby undermine state receivership laws."). *Second*, the court held that the putative intervenor could not trace its interest to the Defendant in rem, or any particular part of it. *See id.* at 416 (that "the property allegedly subject to the constructive trust . . . is not readily identifiable or traceable to the property subject to forfeiture . . . weighs *strongly*" against recognizing the alleged interest as sufficient to confer standing to intervene (emphasis in original)).

This precise reasoning should be employed here. Indeed, the first point – that allowing Fox to pursue her claims individually would open the floodgates to others to do the same,

24

thereby undermining the statutory schemes designed to distribute assets – is precisely what Judge Lifland held in enjoining the Florida action. *See Picard v. Fox*, 429 B.R. at 432, 437.  That reasoning applies equally to the forfeiture proceedings:  as a customer, Fox must pursue her claims through the SIPA proceedings by filing a customer claim, and as a victim of a criminal offense (as discussed further below) she must do so by filing a petition at the appropriate time and in accordance with applicable Department of Justice regulations.  Only if she has an independent claim against the Picower estate – in part the subject of both appeals before Judge Koeltl – may Fox pursue a separate claim, and even then she must do it in the Florida action, not in this one.

That is so because the second rationale of the *Peoples* decision – that the intervenor needs to articulate a specific interest in the Defendant in rem or a portion thereof – also applies here. Indeed, Fox readily concedes that she does not have a defined interest:  it is "yet to be determined."  Claim ¶ 5.  *See Peoples*, 271 F.3d at 416.

**C.      Fox Lacks Statutory Standing to Assert Her Claim**

For the same reason, Fox lacks statutory standing to assert her claim under Supplemental Rule G(5), which requires that she articulate, among other things, "the specific property claimed" and to "identify . . . [her] interest in the property."  Supp. R. G(5)(a)(i)(A), (B).  She also lacks statutory standing because she failed to file an answer to the Complaint, a prerequisite under Rule G(5).

**1.      Fox's Claim Fails to Identify the Property in Which She Has an Alleged Interest**

A claimant who fails to comply with the requirements of 18 U.S.C. § 983(a)(4) or Rule G(5) lacks statutory standing to contest the forfeiture action.  *See, e.g.*, *United States v. $487,825.00 in United States Currency*, 484 F.3d 662, 664 (3d Cir. 2007) (claimant who fails to

25

comply with the procedural requirements of Rule C(6) – the predecessor to Rule G(5) – and section 983(a)(4)(A) lacks statutory standing to intervene in a forfeiture action).  Under the Supplemental Rules, the Government may move to dismiss a claim "at any time before trial . . . for failing to comply with Rule G(5)."  Rule G(8)(c)(i)(A).  Thus, the court may strike a claim or answer at the pleadings stage for lack of statutory standing.

Fox's claim plainly does not comply with Rule G(5).  *First*, her claim fails to identify the specific property in which she claims an interest.  She cannot allege ownership or any other specific legal interest in the funds forfeited by the Picower estate, nor does she try to do so.  Indeed, Fox cannot even allege the *amount* of funds she believes she is owed.  That Fox does not have, and cannot allege, an interest in the money forfeited by the Picower estate is obvious.  As a "net winner," she received back every dollar she invested in BLMIS.  Her damages, if any, are based on her expectations (which, by definition, are not tied to any particular funds in the possession of BLMIS, the Picower estate, or any other investors), her erroneously-paid taxes (which funds are obviously not part of the Defendant in rem, since they went to the taxing authorities), and the like.  Indeed, Fox's claim in the Florida action – which she says defines her claim to the Defendant in rem – includes treble damages and punitive damages.

These allegations – which, if found to confer standing, will have the effect of denying Madoff's victims access to billions of dollars in forfeited funds – do not meet the demanding requirements of Rule G(5).  *See, e.g.*, *United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1118-19 (9th Cir. 2004) ("The danger of false claims in [forfeiture] proceedings is substantial, requiring courts to demand[ ] more than conclusory or hearsay allegations of some 'interest' in the forfeited property." (internal quotation marks and citations omitted)); *see also Mercado v. U.S. Customs Service*, 873 F.2d 641, 645 (2d Cir. 1989) ("Because there is a

substantial danger of false claims in forfeiture proceedings . . . more was required than the conclusory, hearsay, on-information-and-belief statement of [claimant's] lawyer. . . . Claims in *in rem* forfeiture proceedings usually involve substantial sums of money and lend themselves readily to the filing of false claims.").

### 2.    Fox Failed to File an Answer

As noted above, a claimant must serve and file an answer to the complaint or a motion under Federal Rule of Civil Procedure 12 within 20 days after filing her claim.  *See* Suppl. R. G(5)(b); 18 U.S.C. § 983(a)(4)(B).  Courts routinely dismiss claims for failure to comply with this requirement.  *See, e.g.*, *United States v. 40 Acres of Real Property, More or Less*, 629 F. Supp. 2d 1264, 1274 (S.D. Ala. 2009) (dismissing claim because claimants did not file an answer and failed "to identify any special or extenuating circumstances that might warrant relaxation of the Supplemental Rule G(5)(b) requirement that they file an answer within 20 days after their claim," were "unquestionably on notice of their duty to file an answer," and never petitioned the Court for an extension of time to file an answer); *United States v. Commodity Account No. 549 54930*, 219 F.3d 595, 597 (7th Cir. 2000) (affirming summary judgment in favor of government in part because claimant filed an answer two years after filing his claim and therefore did not have statutory standing); *United States v. $1,437.00 U.S. Currency*, 242 F. Supp. 2d 193, 195-96 (W.D.N.Y. 2002) (granting motion for default judgment where claimant did not file a claim and filed an untimely answer); *United States v. $345,510.00 in U.S. Currency,* No. 01 Civ. 497 (PAM/JGL), 2002 WL 22040, at *3 (D. Minn. 2002) (striking claim because claimant failed to file an answer).

Fox's familiarity with Rule G is apparent from the face of her claim (which cites it), and her familiarity with the forfeiture laws and regulations generally is apparent from her motion to

intervene, which contains an extended discussion of why, in her view, the Government failed to comply with them. Because Fox was on notice of the requirement that she file an answer but chose not to do so, she lacks statutory standing.

*    *    *

In sum, Fox lacks constitutional and statutory standing to participate in this case. Her motion should be denied and her claim dismissed for that reason alone.

**POINT II**

**FOX'S CONTENTION THAT SHE IS A VICTIM IS PREMATURE**

The main right that Fox claims she is trying to protect is her ability to participate in distributions of forfeited money. *See* Mot. at 7. She contends that she is a victim of the fraud, and so entitled to be made whole through the forfeiture fund. That argument is premature, and likely incorrect.

**A.    The Remission and Mitigation Process**

In connection with the criminal proceedings against Madoff, Judge Chin determined that the number of victims of Madoff's fraud was so large as to make restitution impracticable, and permitted the Government to proceed through the process of remission and mitigation, as authorized by the forfeiture laws. *See* Order dated September 24, 2009, in *United States v. Madoff*, 09 Cr. 213 (DC).

Under the remission process, "the Attorney General is authorized to . . . restore forfeited property to victims" on the basis of their "petitions for mitigation or remission." 21 U.S.C. § 853(i)(1). The remission process is governed by 28 C.F.R. Part 9, which furnishes both the procedures for submitting and deciding petitions, as well as the substantive standards by which petitions are measured. Both are relevant here.

28

As far as procedure is concerned, the authority to grant petitions for remission resides in the Department of Justice, and specifically in its Asset Forfeiture and Money Laundering Section.  *See* 28 C.F.R. § 9.1(b)(2); *see also id.* § 9.4(e) (petitions to be filed with the Department of Justice).  The regulations likewise explain the necessary components of a successful petition.  *See id.* § 9.4(c) (specifying the form and content of petitions).

The regulations also govern who is entitled to remission.  First and foremost, aside from people with an interest in specific property, such as lienholders, remission is available only to "victims," *see id.* §§ 9.2(o), 9.8, which the regulations define as:

> a person who has incurred a pecuniary loss as a direct result of the commission of the offense underlying a forfeiture. A drug user is not considered a victim of a drug trafficking offense under this definition. A victim does not include one who acquires a right to sue the perpetrator of the criminal offense for any loss by assignment, subrogation[,] inheritance, or otherwise form [*sic*] the actual victim, unless that person has acquired an actual ownership interest in the forfeited property.

*Id.* § 9.2(v); *see also id.* § 9.8(a)(1) (requiring victims to demonstrate that a "pecuniary loss of a specific amount has been directly caused by the criminal offense, or related offense, that was the underlying basis for the forfeiture").[9]

The regulations further define "pecuniary loss":

> Pecuniary loss. The amount of the pecuniary loss suffered by a victim for which remission may be granted is limited to the fair market value of the property of which the victim was deprived as of the date of the occurrence of the loss.  No allowance shall be made for interest foregone or for collateral expenses incurred to recover lost property or to seek other recompense.

*Id.* § 9.8(b).  The regulations, moreover, are clear that tort claims based upon the illegal acts underlying the forfeiture are not compensable losses:

---

[9]    "General creditors" and "Judgment creditors" who have not obtained a perfected judgment lien are explicitly *not* entitled to petition for remission.  *See* 28 C.F.R. §§ 9.6(a), (f).

> A tort associated with illegal activity that formed the basis for the forfeiture shall not be a basis for remission, unless it constitutes the illegal activity itself, nor shall remission be granted for physical injuries to a petitioner or for damage to a petitioner's property.

*Id.* § 9.8(c).

## B.    Fox Is Probably Not a Victim, But That Issue Is Not Before the Court

Applying these standards, the Government is highly skeptical of Fox's claim that, as a "net winner," she is a victim.  Indeed, because she received every dollar that she invested into BLMIS, no money was stolen directly from her and it is hard to see how any loss she may have suffered was the "direct result of the commission of the offense underlying a forfeiture"  28 C.F.R. § 9.2(v).  Rather, all of her claims are decidedly indirect:  she "assert[s] injuries in the form of lost investment income and returns on [her] BLMIS investments, and tax payments made in connection with non-existent profits . . . [and] additional harm in the form of 'exposure for monetary losses in connection with the Trustee's clawback efforts.'"  *Picard v. Fox*, 429 B.R. at 429.  *See also* 28 C.F.R. § 9.8(b) ("No allowance shall be made for interest foregone or for collateral expenses incurred to recover lost property or to seek other recompense.").  That these sorts of claims probably do not suffice to make her a victim under the forfeiture regulations is underscored by the fact that she is pursuing her injuries via tort claims in the Florida action.  *See id.* at 429 (listing causes of action asserted in the Florida case).

Whether Fox is one of Madoff's victims within the meaning of the remission regulations, however, is respectfully not an issue before this Court.  By virtue of Judge Chin's order in the criminal case, that is an issue to be resolved by the Department of Justice in the process of petitions for remission or mitigation.  When and if Fox submits a petition, the Department of Justice will determine whether she meets the criteria for remission.  Until that time – although, as

just discussed, the Government is skeptical of Fox's contention that she can be a victim – no decision has been made.[10]

That Fox's victimhood is not an issue for this Court is illustrated by the fact that, as noted above, *see supra* note 1, there are a multitude of civil and criminal forfeiture cases pending or already resolved in this district stemming from Madoff's fraud.  A victim in one case must be a victim in all cases, entitled to share in all of the forfeited funds or none of them.  The forfeiture laws therefore channel (in cases where forfeited assets are to be distributed to victims) the determination of who is a victim entitled to participate in the forfeiture fund to one of two places: either (1) the criminal court with jurisdiction over the offenses giving rise to forfeiture, who makes the determination in the context of a restitution order, or (2) the Department of Justice under the petition for remission or mitigation process, if the criminal court determines that restitution is impracticable.  Judge Chin elected the second path here, and therefore the determination of whether or not a claimant has a valid petition as a victim of the fraud is, unreviewably, for the Department of Justice to make.  *See generally United States v. Approximately 1,170 Carats of Rough Diamonds Seized at John F. Kennedy Intern. Airport on January 13, 2004*, No. 05 Civ. 5816 (ARR), 2008 WL 2884387, at *14-15 (E.D.N.Y. July 23, 2008) (in civil forfeiture case, court "is not empowered" to review determination of petition for remission or mitigation); *United States v. One 1970 Buick Riviera Bearing Serial No. 494870H910774*, 463 F.2d 1168, 1170 (5th Cir.) (Attorney General has unreviewable discretion over remission or mitigation of forfeitures), *cert. denied*, 409 U.S. 980 (1972).

---

[10]    The time to file petitions for remission or mitigation has not yet begun.  The Government anticipates that notice of the remission process and the applicable dates and petition requirements will commence later this year.

Finally, as an adjunct to her argument that she is a victim, Fox suggests that the Government has somehow prejudged the issue by giving control of the disposition of the forfeited funds to the Trustee. *See* Mot. at 1. Because the Trustee has already determined that she does not have a valid customer claim under SIPA, Fox reasons, she has already been determined not to be a victim entitled to participate in the forfeiture applying the same standards. That is simply not true.

Petitions for mitigation or remission of forfeiture are decided by the Department of Justice, according to the criteria set forth in 28 C.F.R. Part 9. The Government may contract with a special master to notify potential petitioners, process petitions, and make recommendations to the Department of Justice on the distribution of forfeited property to petitioners. See 28 C.F.R. § 9.9(c). Here, the Government has retained Irving H. Picard – who also serves as the Trustee – as its special master. Picard will therefore wear "two hats": SIPA Trustee and DOJ special master. He will also administer two funds – the SIPA customer fund and the funds forfeited by the Government, which will not be commingled – which will be paid out at the appropriate time according to two separate statutory schemes. Although the Government anticipates that the overlap between SIPA "customers" and forfeiture "victims" will be substantial, it may not be identical, and in any the remission determinations case will be decided by officials within the Department of Justice by reference to the appropriate regulations. The forfeited funds, in short, will not be distributed pursuant to SIPA, nor will the Trustee have the ultimate decision-making authority with respect to the distribution of the forfeiture fund. So while the Government is skeptical that Fox can demonstrate that she is a victim, for all the reasons given above, that decision will be made only when and if she files a petition, and it will be based *solely* Lawson the application Department of Justice regulations.

32

**POINT III**

**THE GOVERNMENT'S COOPERATIVE RELATIONSHIP WITH THE TRUSTEE, INCLUDING CREDITING HIS SETTLEMENT WITH THE PICOWER ESTATE, IS ENTIRELY APPROPRIATE**

Finally, even if one were to assume that Fox had standing to intervene in this suit *and* that she is a victim within the meaning of the forfeiture laws, her objection and claim still would be meritless.  At base, Fox claims that by allowing the Trustee to take $5 billion, the Government has injured Fox – either because she has her own claim against the Picower estate through the Florida action,[11] or because she is a victim entitled to recover through the forfeiture fund (which is diminished by the offset of the Trustee's settlement), or both.  But the Government's agreement to credit the Trustee's settlement with the Picower estate is entirely appropriate.

As an initial matter, Fox's argument that the Trustee is entitled to only $2.4 billion from the Picower estate is wrong.  *See* Mot. at 4 (Picower accounts made $2.4 billion in avoidable transfers in the six years before the SIPA filing).  That view assumes that the Trustee has no ability to avoid transfers more than six years old.  To be sure, the New York State statute under which the Trustee originally sued Picower has a six-year "look back" period, and Picower moved to dismiss the Trustee's complaint, in part, on the grounds that claims against transfers outside of the six-year period were time-barred.  The Trustee, however, argued that the statute of

---

[11]    Fox argues that, "[b]ased on the undisputed facts, it is reasonable to conclude that the Trustee has negotiated a settlement far in excess of the amount he is entitled to receive from [the] Picower Defendants in order [to] divest the Picower Defendants of the assets that should be available to satisfy the valid and independent claims asserted by the Fox Plaintiffs."  Mot. at 13.  Not only is this *not* a reasonable conclusion, the bankruptcy court expressly concluded to the contrary.  *See* Order dated Jan. 13, 2011, at ¶ 4, Picard v. Picower, No. 09-1197 (BRL).  In any event, the amount of the Trustee's settlement is irrelevant to the assets available from the Picower estate, since the Trustee's settlement is subsumed within the Government's – whether the Trustee gets $5 billion or nothing, the Picower estate is obliged to pay $7.2 billion to the United States Government, represented by the United States Attorney's Office for the Southern District of New York.  *See infra*, note 12.  Nor is it clear why the Picower estate would be motivated to pay more to the Trustee just to avoid paying the same money to Fox.

33

limitations was extended either by virtue of New York's "discovery rule," or by virtue of some tolling doctrine. In his settlement papers, the Trustee identified the possibility of an adverse ruling on this point as one of the reasons he was willing to accept less than the full amount of Picower's transfers from BLMIS. The bankruptcy court agreed and accepted the settlement. It is therefore settled (at least, subject to the pending appeal) that the Trustee's settlement was appropriate.

Moreover, in a recent decision in another Madoff-related adversary proceeding, Judge Lifland sided with the Trustee on this very issue, holding that the discovery rule applies and that the Trustee is not limited to six years of avoidable transfers, but may seek to avoid transfers going back to the beginning of the investor's relationship with BLMIS. *See Picard v. Chais*, – B.R. –, 2010 WL 5841402, at *16-18 (Bankr. S.D.N.Y. Feb. 24, 2011).

That being so, there is nothing remotely improper about the Government's agreement to credit the Trustee's valid settlement against the forfeiture amount. Indeed, any other result would either require the Picower estate to pay more in "settlement" of its Madoff-related liabilities than it actually took out of BLMIS in fictitious profits, or require the Trustee and the Government to litigate between themselves – the likely result of which would be a settlement that forfeited to the Government less than 100% of the proceeds, and thus be subject to the same objections. Indeed, taken to its logical extreme, Fox's position would require the Government to litigate to judgment every forfeiture case.

Not surprisingly, that is not the law. Rather, the Government is free to compromise its claims for forfeiture when appropriate. *See generally* 21 U.S.C. § 853(i)(2) (authorizing compromise of criminal forfeiture claims); *accord In re W.R. Huff Asset Mgmt. Co.*, 409 F.3d 555, 564 (2d Cir. 2005); *cf. United States v. U.S. Currency in the Sum of Six Hundred Sixty*

34

*Thousand, Two Hundred Dollars ($660,200.00), More or Less*, 423 F. Supp. 2d 14 (E.D.N.Y. 2006) (discussing compromise of civil forfeiture claims).

In the context of bankruptcies – where the Government and a trustee are often looking to the same assets to satisfy similar, but not necessarily identical, constituencies – courts in this district have been especially supportive of cooperation, or at least coordination.  For example, in the various proceedings stemming from Marc Dreier's operation of a Ponzi scheme through his law firm, Judge Jed S. Rakoff explained:

> For some time now, it has been evident to this Court in presiding over the criminal action against Dreier, and to the judges presiding over the civil enforcement action brought against Dreier by the Securities and Exchange Commission and the bankruptcy proceedings involving the estates of Dreier and his law firm, Dreier LLP, that these inherent tensions are best addressed through coordination and cooperation by all concerned.  Accordingly, on April 22, 2009, the three judges convened a joint hearing to urge such a resolution by the affected parties.

*United States v. Dreier*, 682 F. Supp. 2d 417, 417 (S.D.N.Y. 2010).

Subsequently, the Government entered into a so-called "Coordination Agreement" with the Chapter 11 trustee of Dreier LLP, the principal aim of which was to identify the assets that the Government would seek to forfeit as part of the criminal case, on the one hand, and the assets that the trustee would seek to marshal as part of the bankruptcy estate, on the other.  In broad strokes, the Coordination Agreement represented an agreement between the Government and the trustee to divide up Dreier LLP's assets (including assets held by third parties) between the forfeiture and bankruptcy proceedings.  Under the agreement, the Government forfeited all of the property listed in a Preliminary Order of Forfeiture in the criminal case, as well as approximately $30 million held by a third party, who was a "net winner" of the fraud.  In turn, the Government agreed to release to the trustee certain property (artwork, mostly) in its possession but not part of

35

the forfeiture order and not to forfeit the proceeds of avoidance actions against certain specified targets.

Thus, unlike here, in *Dreier* the Government agreed to forgo recovery from certain third parties altogether. As here, there were objections, including from (undisputed) victims of the fraud, who did not want assets flowing through the bankruptcy, where any recovery to victims would be diluted by administrative expenses and the need to share with non-victim trade creditors. But Judge Rakoff approved the agreement, finding that "from the standpoint of federal criminal law, especially the provisions of federal criminal law dealing with forfeiture and restitution," the agreement was both "reasonable and in the best interests of the victims collectively." *Dreier*, 682 F. Supp. 2d at 419, 421. *See also In re Dreier LLP*, 429 B.R. 112 (Bankr. S.D.N.Y. 2010) (approving *Dreier* coordination agreement from perspective of bankruptcy law), *aff'd*, Nos. 10 Civ. 4758 (DAB), 10 Civ. 5669 (DAB), 2010 WL 3835179 (S.D.N.Y. Sept. 10, 2010).

The arrangement between the Government and the Trustee in this case is even more obviously beneficial to victims than was the coordination agreement in *Dreier*. In that case, the Government agreed to forgo recovery from certain third parties – the "net winners" of the fraud – entirely, assuming the trustee pursued her litigation against them. Here, the Government has merely credited against funds forfeited by a third party the amount of the trustee's settlement. This is not a novel arrangement by any means. *See, e.g.,* Consent Order of Forfeiture at 3 and ¶ 1 (crediting $3.75 million settlement between third party and bankruptcy trustee of Refco against

36

$5 million forfeiture to the United States), *United States v. Funds on Deposit at Bear Stearns*, No. M18-981 (S.D.N.Y. Dec. 2, 2008) (Buchwald, *J.*).[12]

The results in this case speak for themselves.  Utilizing this cooperative model, the Government and the Trustee have recovered every penny of fictitious profits from the Picower estate, for a total of $7.2 billion, as well as $625 million from another "net winner" and his family, representing more than the net total amount of his and his wife's withdrawals, *see* Stipulation and Order of Settlement at 2, *United States v. $625,000,000 on Deposit at JPMorgan Chase Bank, N.A.*, No. 10 Civ. 9116 (TPG).  And, of course, the Government and the Trustee are hopeful that there will be future cooperative recoveries, as well.  There can be no serious dispute that this outcome is "reasonable and in the best interests of the victims collectively."  *Dreier*, 682 F. Supp. 2d at 421.

---

[12]    In the Refco forfeiture, the third party agreed to "forfeit" $1.25 million to the Government and pay $3.75 million to the trustee (under a separate agreement), while recognizing a $5 million "obligation."  The Government could certainly have employed that structure here, "forfeiting" $2.2 billion and allowing the Picower estate to separately pay $5 billion to the Trustee.  The structure of the Stipulation as negotiated provides considerably more protection to Madoff's victims, however.  By forfeiting the full $7.2 billion to the United States and then offsetting any payment to the Trustee up to $5 billion, the Government has ensured that Madoff's victims will receive the full $7.2 billion (assuming a final order of forfeiture) even if the bankruptcy settlement were to somehow be disrupted.  *See* Stip. ¶ 7 (requiring escrow agent to pay the $5 billion subject to the bankruptcy settlement to the Government in either of two events: if the bankruptcy settlement is rejected, or if the bankruptcy settlement amount is not paid to the Trustee within 3 years of the date of the Stipulation).

**CONCLUSION**

At base, this case is about whether $7.2 billion in criminal proceeds should be forfeited for the benefit of the victims of Madoff's crimes. It is not about who those victims are.  Because the funds are undisputedly forfeitable and because Fox has demonstrated no particularized ownership or other property interest in them, the Court should deny Fox's motion to intervene and to amend or otherwise undo the Settlement Agreement, dismiss her claim to the Defendant in rem, and enter a final order of forfeiture.  (A proposed order is attached hereto as Exhibit B). Fox will, of course, still be free to file a petition as a victim in the remission and mitigation process.

Dated:  March 18, 2011
       New York, New York

                               Respectfully submitted,

                               PREET BHARARA
                               United States Attorney
                               Attorney for the United States of America

                               /s/  Matthew L. Schwartz
                               MATTHEW L. SCHWARTZ
                               BARBARA A. WARD
                               Assistant United States Attorneys
                               One Saint Andrew's Plaza
                               New York, New York 10007
                               Tel.: (212) 637-1945/1048
                               Facsimile:  (212) 637-2937
                               E-mail:  matthew.schwartz@usdoj.gov